## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **MERCEDE MARYLAND**, on behalf of herself and all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>**CORBAN ONESOURCE LLC**,<br><br>      Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Mercede Maryland ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Corban OneSource LLC ("Corban OneSource" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2.     Defendant is a business-to-business provider of "HR services" including payroll management, compliance, and benefits management.[1]

3.     Defendant advertises that its current clients include, *inter alia*, Courtyard Marriot, Embassy Suites Hotels, StarKist, and Major League Baseball (the "MLB").[2]

4.     As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") about the current and former employees of Defendant's current and former clients (e.g., the current and former employees of Courtyard Marriot).

5.     But Defendant lost control over that data when its insufficiently protected computer systems were infiltrated by the Russian cybercriminal syndicate "Qilin" on October 3, 2025 (the "Data Breach").[3]

6.     It is unknown for precisely how long Qilin had access to Defendant's network before the breach was discovered. In other words,

---

[1] *About Us*, CORBAN ONESOURCE, https://www.corbanone.com/about-corban-onesource-learn-about-comprehensive-hr-outsourcing (last visited Oct. 16, 2025).

[2] *Id.*

[3] *See, e.g., Ransomware Group qilin Hits: Corban OneSource*, Hook Phish (Oct. 4, 2025) https://www.hookphish.com/blog/ransomware-group-qilin-hits-corban-onesource/; *[QILIN] – Ransomware Victim: Corban OneSource*, Red Packet Security (Oct. 7, 2025) https://www.redpacketsecurity.com/qilin-ransomware-victim-corban-onesource/; *Qilin*, RANSOMLOOK (Oct. 4, 2025) https://www.ransomlook.io/group/qilin; *Corban OneSource*, Breachsense (Oct. 6, 2025) https://www.breachsense.com/breaches/corban-onesource-data-breach.

Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing Qilin unrestricted access to its current and former clients' PII.

7.    On information and belief, Qilin was able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals (including Qilin).

8.    Plaintiff is a former employee of Embassy Suites Hotels (which is client of Defendant). Now she is a Data Breach victim. She brings this class action on behalf of herself, and all others harmed by Defendant's misconduct.

9.    The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former clients' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10.    Plaintiff, Mercede Maryland, is a natural person and a citizen of Tennessee. She is domiciled in Tennessee (where she intends to remain).

11.    Defendant, Corban OneSource LLC, is a Florida limited liability company with its principal place of business at 13577 Feather Sound Drive, Suite 450, Clearwater, Florida 33762.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).

13.    Because jurisdiction arises under CAFA, Defendant Corban OneSource LLC is a citizen of Florida (because Defendant is an LLC formed under the laws of Florida and with its principal place of business in Florida). *See* 28 U.S.C. § 1332(d)(10). In the CAFA context, "limited liability companies are treated as unincorporated associations for jurisdictional purposes . . . [and] for the CAFA's jurisdictional purposes, an unincorporated association is a citizen of the state in which it is organized and the state of its principal place of business." *Alvarez v. Loancare LLC*, No. 20-21837-CIV, 2021 U.S. Dist. LEXIS 9281, at *20-21 (S.D. Fla. Jan. 19, 2021); *see also 15 Oz Fresh & Healthy Foods LLC v. Lloyd's London Known as Syndicates AML 2001*, No. 21-10949, 2022 U.S. App. LEXIS 28200, at *4 (11th Cir. Oct. 11, 2022) ("CAFA controls class actions, and provides that 'an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.'"); *Briggs v. N. Highland Co.*, No. 1:22-CV-03640, 2024 U.S. Dist. LEXIS 53888, at *2 n.1 (N.D. Ga. Mar. 11, 2024)

("The normal rule regarding citizenship of a limited liability company does not apply in CAFA cases.").

14.    Thus, minimal diversity is satisfied because Plaintiff is a citizen of Tennessee and Defendant is a citizen of Florida.

15.    There are over 100 putative Class Members because many of Defendant's clients—e.g., Courtyard Marriot, Embassy Suites Hotels, StarKist, and Major League Baseball—have thousands of employees. Moreover, Defendant advertises that it has "developed solutions for our partners with 75-6,000 employees."[4]

16.    The amount in controversy exceeds $5 million, exclusive of interest and costs.

17.    This Court has personal jurisdiction over Defendant because it is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida.

18.    Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

---

[4]    *HR Outsourcing Case Study*, CORBAN ONESOURCE, https://www.corbanone.com/hr-case-studies (last visited Oct. 16, 2025).

## BACKGROUND

### *Defendant Collected and Stored the PII of Plaintiff and the Class*

19.    Defendant is a business-to-business provider of "HR services" including payroll management, compliance, and benefits management.[5]

20.    Defendant advertises that its current clients include, *inter alia*, Courtyard Marriot, Embassy Suites Hotels, StarKist, and Major League Baseball (the "MLB").[6] A screenshot of Defendant's website is provided below.



21.    As part of its business, Defendant receives and maintains the PII of thousands of its current and former clients.

22.    In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members (or their third party agents)themselves took reasonable steps to secure their PII.

---

[5] *About Us*, CORBAN ONESOURCE, https://www.corbanone.com/about-corban-onesource-learn-about-comprehensive-hr-outsourcing (last visited Oct. 16, 2025).
[6] *Id.*

23.    Under state and federal law, businesses like Defendant have duties to protect its current and former clients' PII and to notify them about breaches.

24.    Defendant recognizes these duties, declaring in its "Privacy Policy" that:

    a.    "We will not use or share your information/data with anyone except as described in this Privacy Policy."[7]

    b.    "We value your trust in providing us your data/information, thus we are striving to use commercially acceptable means to protect it."[8]

### Qilin & the Dark Web

25.    So far, numerous cybercrime reporters have confirmed that Qilin hacked Defendant during the Data Breach (as detailed *infra*).[9]

---

[7] *Privacy Policy*, CORBAN ONESOURCE, https://www.corbanone.com/privacy-policy-2/ (last visited Oct. 16, 2025).

[8] *Id.*

[9] *See, e.g., Ransomware Group qilin Hits: Corban OneSource*, Hook Phish (Oct. 4, 2025) https://www.hookphish.com/blog/ransomware-group-qilin-hits-corban-onesource/; *[QILIN] – Ransomware Victim: Corban OneSource*, Red Packet Security (Oct. 7, 2025) https://www.redpacketsecurity.com/qilin-ransomware-victim-corban-onesource/; *Qilin*, RANSOMLOOK (Oct. 4, 2025) https://www.ransomlook.io/group/qilin; *Corban OneSource*, Breachsense (Oct. 6, 2025) https://www.breachsense.com/breaches/corban-onesource-data-breach.

26.    Qilin is an especially notorious cybercriminal syndicate.[10] And the federal Office of Information Security has reported the following:

    a.    "Qilin is a ransomware-as-a-service (RaaS) offering in operation since 2022, and which continues to target healthcare organizations and other industries worldwide."[11]

    b.    "The group likely originates from Russia[.]"[12]

    c.    "[Qilin] actors practice double extortion and operate a data leak site (DLS) where victims are posted."[13]

    d.    "Victims are directed to communicate with the attackers via dark web portals or encrypted messaging services, ensuring the attackers' anonymity and complicating law enforcement efforts to track interactions."[14]

    e.    "Payments are demanded in cryptocurrencies, such as Bitcoin or Monero."[15]

---

[10] *Qilin, aka Agenda Ransomware*, OFF. INFO. SEC. (June 18, 2024) https://www.hhs.gov/sites/default/files/qilin-threat-profile-tlpclear.pdf.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

      f.    "However, even after payment, there is no guarantee that victims will receive the decryption tools required to recover their data."[16]

27.    Qilin is notorious for following through on its threats—and leaking the stolen PII on the Dark Web.[17] For example, in 2024, the BBC reported that the Russia-based Qilin had hacked a "NHS pathology testing provider" and then "shared almost 400GB of the private information on their darknet site."[18] Thereafter, the BBC confirmed that "the data seen by the BBC includes patient names, dates of birth, NHS numbers and descriptions of blood tests."[19] And "[o]n their darknet site, they also have stolen data from other healthcare organisations, as well as schools, companies and councils from around the world."[20]

28.    Similarly, on October 7, 2025, Qilin leaked 27 gigabytes of sensitive data stolen from the Japanese beverage company "Asahi Group

---

[16] *Id.*

[17] Joe Tidy, *Stolen test data and NHS numbers published by hospital hackers*, BBC (June 21, 2024) https://www.bbc.com/news/articles/c9ww90j9dj8o.

[18] *Id.*

[19] *Id.*

[20] *Id.*

Holdings, Ltd."[21] A screenshot of the Dark Web leak site is provided below (with redactions as necessary).[22]



### *The Data Breach*

29.     Numerous cybercrime reporters have confirmed that Qilin hacked Defendant during the Data Breach on October 3, 2025.[23]

---

[21] *Qilin Ransomware and the Ghost Bulletproof Hosting Conglomerate*, RESECURITY (Oct. 15, 2025) https://www.resecurity.com/blog/article/qilin-ransomware-and-the-ghost-bulletproof-hosting-conglomerate.
[22] *Id.*
[23] *See, e.g., Ransomware Group qilin Hits: Corban OneSource*, HOOK PHISH (Oct. 4, 2025) https://www.hookphish.com/blog/ransomware-group-qilin-hits-corban-onesource/; *[QILIN] – Ransomware Victim: Corban OneSource*, RED PACKET SECURITY (Oct. 7, 2025) https://www.redpacketsecurity.com/qilin-ransomware-victim-corban-onesource/.

30.    For example, Breachsense is a cybersecurity firm that provides "Real-time Data Breach Monitoring" for enterprise customers and "monitors the dark web for potential data breaches[.]"[24] Breachsense reported the following about the Data Breach:

| Data Breach Report | |
|---|---|
| Victim | corbanone.com |
| Threat Actor | Qilin |
| Date Discovered | Oct 06, 2025 |
| Description | Corban OneSource is an HR outsourcing company based in the USA (Florida), offering services in payroll administration, benefits management, and HR support for mid-size organizations. |
| Leak Size | Unknown |

---

[24]    *Corban    OneSource*,    BREACHSENSE    (Oct.    6,    2025) https://www.breachsense.com/breaches/corban-onesource-data-breach/.

31.    Similarly,   on   October   4,   2025,   the   ransomware   tracker



"RansomLook" reported that Qilin hacked Defendant.[25]A screenshots of the RansomLook website is provided below.[26]

32.    Therein, RansomLook provided the following screenshot of the Dark Web—revealing the Qilin **already leaked** a variety of documents containing sensitive PII on the Dark Web (the screenshot is redacted in red to prevent the further dissemination of the PII of Plaintiff and Class Members).[27] The documents include, at least, addresses, cell phone numbers, email addresses, and what appears to be HR employment documents (which include sensitive PII).[28] On information and belief, these documents contain the PII of Class Members.

---

[25] *Qilin*, RANSOMLOOK (Oct. 4, 2025) https://www.ransomlook.io/group/qilin.
[26] *Id.*
[27] *Id.*
[28] *Id.*



33.    Therein, Qilin provided various methods for other cybercriminals to contact Qilin and/or access the leaked documents and PII:

a.    Qilin provided "QR code" which on information and belief enables other cybercriminals to contact Qilin and/or obtain the PII of Plaintiff and Class Members.[29]

b.    Qilin provided hyperlink to "WikileaksV2" which on information and belief enables other cybercriminals to contact Qilin and/or obtain the PII of Plaintiff and Class Members.[30]

---

[29] *Id.*
[30] *Id.*

c.     Qilin provided an IP address which on information and belief enables other cybercriminals to contact Qilin and/or obtain the PII of Plaintiff and Class Members.[31] The specific IP address is "64.176.XXX.XX" (the last five digits are not reproduced here to prevent the further dissemination of the PII of Plaintiff and Class Members).[32]

d.     Qilin provided a username of "qilin@exploit.im"[33] for "Jabber" which is an encrypted instant messaging service.[34] On information and belief, this username enables other cybercriminals to contact Qilin and/or obtain the PII of Plaintiff and Class Members.

e.     Qilin provided an identification number for "Tox"[35] which is an encrypted messaging platform that enables cybercriminals to "[t]rade files, with no artificial limits or caps[.]"[36] For context, Tox advertises that "Tox has no central servers that can be raided, shut down, or forced to

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *See FAQ*, JABBER, https://jabber.org/faq.html#jabber (last visited Oct. 16, 2025).

[35] *Qilin*, RANSOMLOOK (Oct. 4, 2025) https://www.ransomlook.io/group/qilin.

[36] *Home Page*, TOX, https://tox.chat/ (last visited Oct. 16, 2025).

turn over data — the network is made up of its users" and that "[w]hether it's corporations or governments, digital surveillance today is widespread. Tox is easy-to-use software that connects you with friends and family without anyone else listening in."[37]

34.    Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendant's custody and control. And upon information and belief, the putative class includes thousands of individuals.

35.    So far, Defendant has not provided notice of the Data Breach to Plaintiff or Class Members. Thus, Defendant has kept the Class in the dark— thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

36.    Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and monetary damages.

---

[37] *Id.*

37.    Because of Defendant's Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals (i.e., Qilin) and inflicted numerous injuries and significant damages upon Plaintiff and Class Members.

38.    Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by Qilin on the Dark Web.

### Plaintiff's Experiences and Injuries

39.    Plaintiff Mercede Maryland is a former employee of Embassy Suites Hotels (which is a client of Defendant). She worked for Embassy Suites Hotels from approximately 2023 until 2024.

40.    Pursuant to her employment with Embassy Suites Hotels, Plaintiff provided her PII to Embassy Suites Hotels—including, at least, her name, date of birth, Social Security number, address, phone number, email address, financial account information, and health insurance information.

41.    On information and belief, Embassy Suites Hotels provided the PII of Plaintiff to Defendant in or around 2023 or 2024. Thus, on information and belief, Defendant maintained the PII of Plaintiff during the Data Breach on October 3, 2025. And on information and belief, Qilin then obtained the PII of Plaintiff during the Data Breach.

42.    As a result, Plaintiff was injured by Defendant's Data Breach.

43.    Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner.  She is careful to store any documents containing her PII in a secure location.

44.    Plaintiff (and/or her former employer) provided her PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

45.    Plaintiff (and/or her former employer) reasonably understood that a portion of the funds paid to Defendant (and/or derived from Plaintiff's employment) would be used to pay for adequate cybersecurity and protection of PII.

46.    Plaintiff does not recall ever learning that her information was compromised in a data breach incident—other than the breach at issue here.

47.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by Qilin on the Dark Web.

48.    On information and belief, through its Data Breach, Defendant compromised Plaintiff's PII—including her name, date of birth, Social Security

number, address, phone number, email address, financial account information, and health insurance information.

49.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

50.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages and phone calls.

51.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

52.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

53.    Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

54.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

55.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of Qilin.

56.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

57.    Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**_Consumers Prioritize Data Security_**

58.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[38] Therein, Cisco reported the following:

a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[39]

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their

---

[38] _Privacy Awareness: Consumers Taking Charge to Protect Personal_, Cisco, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[39] _Id._ at 3.

customers would not buy from them if they did not protect data properly."[40]

c. 89% of consumers stated that "I care about data privacy."[41]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[42]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[43]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[44]

### *Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft*

59. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

---

[40] *Id.*

[41] *Id.* at 9.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 11.

a.   loss of the opportunity to control how their PII is used;

b.   diminution in value of their PII;

c.   compromise and continuing publication of their PII;

d.   out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.   lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.   delay in receipt of tax refund monies;

g.   unauthorized use of their stolen PII; and

h.   continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

60.   Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

61.   The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals

frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

62.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

63.    One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

64.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

65.    In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class

Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

66.    Defendant disclosed the PII of Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

67.    Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

68.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

69.    In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e.,  211% increase year over

year).[45]

70.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[46]

71.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

72.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

---

[45] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[46] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

24

73.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[47]  The FTC declared that, *inter alia*, businesses must:

>    a.    protect the personal customer information that they keep;
>
>    b.    properly dispose of personal information that is no longer needed;
>
>    c.    encrypt information stored on computer networks;
>
>    d.    understand their network's vulnerabilities; and
>
>    e.    implement policies to correct security problems.

74.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

75.    Furthermore, the FTC explains that companies must:

>    a.    not maintain information longer than is needed to authorize a transaction;
>
>    b.    limit access to sensitive data;
>
>    c.    require complex passwords to be used on networks;

---

[47] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

   d. use industry-tested methods for security;

   e. monitor for suspicious activity on the network; and

   f. verify that third-party service providers use reasonable security measures.

76. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

77. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former clients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

78. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor

26

authentication; backup data; and limiting which employees can access sensitive data.

79.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

80.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

82.    Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach that impacted Corban OneSource LLC in October 2025.

83.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

84.    Plaintiff reserves the right to amend the class definition.

85.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

86.    <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

87. <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least one thousand members.

88. <u>Typicality</u>. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

89. <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

90. <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

    a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

    b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature

and scope of the information compromised in the Data Breach;

c.    if Defendant were negligent in maintaining, protecting, and securing PII;

d.    if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if Defendant's Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiff and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

91.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy.   The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but

individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

92.    Plaintiff incorporates by reference paragraphs 1–91 as if fully set forth herein.

93.    Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

94.    Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

95.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

96.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII.

97.    Defendant owed—to Plaintiff and Class Members—at least the following duties to:

      a.    exercise reasonable care in handling and using the PII in its care and custody;

      b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

      c.    promptly detect attempts at unauthorized access;

      d.    notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

98.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class

Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

99.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

100.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

101.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

102.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII.

103.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use

reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

104.   Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

105.   The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII —whether by malware or otherwise.

106.   PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

34

107.  Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

108.  Defendant breached these duties as evidenced by the Data Breach.

109.  Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

a.  disclosing and providing access to this information to third parties and

b.  failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

110.  Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

111.  Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

112.   Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

113.   As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

114.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

115.   Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class)

116.   Plaintiff incorporates by reference paragraphs 1–91 as if fully set forth herein.

117.   Plaintiff and Class Members either directly contracted with Defendant or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

118.   Plaintiff and Class Members (or their third-party agents) were required to provide their PII to Defendant as a condition of receiving services provided by Defendant. Plaintiff and Class Members (or their third-party agents) provided their PII to Defendant or its third-party agents in exchange for Defendant's services.

119.   The contracts entered into by Plaintiff's and Class Members' agents (i.e., their employers), were made for the direct benefit of Plaintiff and the Class. Specifically, Plaintiff's and Class Members' third-party agents entered into contracts with Defendant to obtain HR services for Plaintiff and Class Members.

120.   Plaintiff and Class Members (or their third-party agents) reasonably understood that a portion of the funds they paid and/or derived from their labor would be used to pay for adequate cybersecurity measures.

121.   Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity

measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

122.    Plaintiff and the Class Members (or their third-party agents) accepted Defendant's offers by disclosing their PII to Defendant or its third-party agents in exchange for services.

123.    In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

124.    In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

125.    Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

126.    After all, Plaintiff and Class Members (or their third-party agents) would not have entrusted their PII to Defendant (or their third-party agents) in the absence of such an agreement with Defendant.

127.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

128.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according

to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

129. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

130. Defendant materially breached the contracts it entered with Plaintiff and Class Members (or their third-party agents) by:

  a. failing to safeguard their information;

  b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

  c. failing to comply with industry standards;

  d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

  e. failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

131. In these and other ways, Defendant violated its duty of good faith and fair dealing.

132.   Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

133.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

134.   Plaintiff and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

135.   Plaintiff incorporates by reference paragraphs 1–91 as if fully set forth herein.

136.   This claim is pleaded in the alternative to the breach of implied contract claim.

137.   Plaintiff and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII to provide services, and (2) accepting payment from the third-party agents of Plaintiff and Class Members.

138.   Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

139.   Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

140.   Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

141.   Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

142.   Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of (1) Plaintiff's and Class Members' PII and (2) the payment provided by the third-party agents of Plaintiff and Class Members because Defendant failed to adequately protect the PII.

143.   Plaintiff and Class Members have no adequate remedy at law.

144.   Defendant should be compelled to disgorge into a common fund— for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.    Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law;

H.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.    Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: October 17, 2025

Respectfully submitted,

By: */s/ Jeff Ostrow*
Jeff Ostrow FBN 121452
**KOPELOWITZ OSTROW P.A.**
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com

*Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*